[Cite as *State v. Webster*, 2018-Ohio-3698.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                          :
                                                                   :
      Plaintiff-Appellee                          :         Appellate Case No. 27871
                                                                   :
v.                                                                :         Trial Court Case No. 2016-CRB-1357
                                                                   :
MITCHELL D. WEBSTER                           :         (Criminal Appeal from
                                                                   :          Municipal Court)
      Defendant-Appellant                       :
                                                                   :

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of September, 2018.

. . . . . . . . . . .

CHRISTINE L. BURK, Atty. Reg. No. 0050559, 10 N. First Street, Miamisburg, Ohio 45342
      Attorney for Plaintiff-Appellee

NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 2541 Shiloh Springs Road, Trotwood, Ohio 45426
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Mitchell D. Webster appeals from his conviction and sentence following a jury trial on one count of gross neglect of a patient in violation of R.C. 2903.34(A)(2), a first-degree misdemeanor.

{¶ 2} Webster advances two assignments of error. First, he challenges the legal sufficiency and manifest weight of the evidence to support his conviction. Second, he claims the trial court erred in imposing a maximum jail sentence and probation.

{¶ 3} The charge against Webster stemmed from an incident occurring at the Woodglen Alzheimer's Community in the early morning hours of October 6, 2015. At that time, Webster was working at the facility as a state-tested nursing assistant (STNA). His responsibilities included monitoring and assisting a number of Alzheimer's residents. One of those people was an elderly man, R.W., who resided in the "Heatherwood unit" at the facility. (Trial Tr. at 61). Due to his Alzheimer's, R.W. was non-compliant, resistive and, sometimes, combative. (*Id.* at 62). He also fell frequently. (*Id.* at 63, 84, 92, 104-105).

{¶ 4} At trial, Beverly Prichard testified that she was employed as a charge nurse at Woodglen. (*Id.* at 58). Her responsibilities included supervising the unit on which R.W. resided. (*Id.* at 58-59). Two STNAs were working under her supervision, Webster and a woman named Marjorie Gregory. (*Id.* at 60, 64). Protocol at Woodglen provided for STNAs to check on their patients every two hours. It also provides for any injuries to be reported promptly. (*Id.* at 64-65).

{¶ 5} Prichard testified that she sometimes made her own rounds to spot-check on residents. On October 6, 2015, she went into R.W.'s room probably between 2:30 a.m. and 3:00 a.m., but possibly close to 4:00 a.m., to check on him. (*Id.* at 66, 97). He was in

bed resting on his side. Prichard did not notice any problems, and R.W. did not appear to be injured. (*Id.* at 66, 98). Around 6:00 a.m., Prichard was passing out medication when Gregory approached her and reported seeing a "scratch" on R.W.'s face. Gregory asked Prichard to check on R.W. (*Id.* at 67-68). Moments later, Prichard entered R.W.'s room and saw him sitting in his wheelchair "remarkably dressed up" in nice clothes. She also noticed that his face appeared "flat" and that "his nose was moved over, his eyes were beginning to swell." (*Id.* at 69-71). She saw "two red scratches, but no real active bleeding." (*Id.* at 72). R.W. was "just sitting there," and was not very alert or responsive. (*Id.* at 73). Prichard promptly reported the incident to Karen Spiers, the night shift supervisor. (*Id.* at 71-72, 107).

{¶ 6} Spiers testified that she was informed of the incident involving R.W. around 5:30 a.m. (*Id.* at 176). Spiers was "shocked" upon seeing R.W.'s face. (*Id.* at 177). She knew immediately that his nose was broken, but she was confused because there was no blood anywhere and "a broken nose will bleed like a stuck pig." (*Id.*). She also saw a "gash" on R.W.'s forehead and cuts or scratches on his hands. (*Id.* at 178). Webster told Spiers that R.W. just "woke up like that." (*Id.* at 179). Webster denied that R.W. had fallen. He also claimed to have checked on R.W. around 3:00 a.m. (*Id.* at 181-182). Spiers proceeded to report the incident to Angie Copley, the director of nursing. (*Id.* at 180).

{¶ 7} Copley testified that she received a call about the incident around 5:30 a.m. or 5.45 a.m. (*Id.* at 107). She promptly arrived at the facility from home and went to R.W.'s unit. (*Id.* at 108). She observed obvious injuries to his face, including a swollen nose, swollen eyes, redness, a cut to his face, and some cuts on his knuckles. (*Id.*). Soon thereafter, R.W. was transported to a hospital. (*Id.* at 113). Copley then began an internal

investigation involving the pertinent staff, including Prichard, Spiers, Gregory, Webster, and another STNA employee. (*Id.* at 112). The immediate response was that no one knew anything. (*Id.* at 111). Webster reported to Copley that he had checked on R.W. around 11:00 p.m. and then again around 2:00 a.m. and that the injuries were not present then. (*Id.* at 118). Webster stated that he noticed the injuries while getting R.W. up around 4:45 a.m. or 5:00 a.m. (*Id.* at 119).

{¶ 8} Copley testified that Webster called Woodglen the following day and reported that he had more information to provide. (*Id.* at 121). Webster came to the facility and met with Copley. She testified that he told her he actually had not checked on R.W. all night. When he finally did check the room around 4:45 a.m., he saw R.W. naked behind the door with blood everywhere. (*Id.*). Webster explained that he "got scared" and proceeded to clean up R.W. (*Id.* at 121-122). According to Copley, Webster acknowledged that he was responsible for looking after R.W. (*Id.* at 122).

{¶ 9} The next witness was police Sergeant Julie Fiebig. She testified about her examination of the scene as an evidence technician. She reviewed photographs depicting the condition of R.W.'s room and showing blood evidence in various locations, including on a wheelchair foot pedal. She also reviewed photographs of his injuries. She noted evidence of blood being cleaned up in Winfield's room due to the presence of "circular" or "swipe" patterns. (*Id.* at 148). Fiebig explained that an untrained person likely only would have noticed "a little bit" of blood in the room. (*Id.* at 156-157). Due to her training, however, she detected "a significant amount of blood[.]" (*Id.* at 157).

{¶ 10} The final prosecution witness was Sergeant Bill Jones. He testified that he investigated R.W.'s injuries. In doing so, he spoke with Webster at the police station on

October 8, 2015. (*Id.* at 198-199). During the voluntary interview, Webster admitted lying to his supervisors. He claimed that he initially did not realize the severity of the situation. He also explained that he had been scared that he would get in trouble because he had not visited R.W.'s room during his shift. (*Id.* at 199-200, 203). According to Jones, Webster proceeded to explain that he arrived for work around 11:00 p.m. and completed a set of rounds at approximately 2:30 a.m. or 3:00 a.m. (*Id.* at 201). But Webster "forgot" that he was responsible for R.W.'s room and one other room, as it was a "newer assignment." (*Id.*). After eating his lunch, Webster reportedly began his rounds again around 4:00 a.m. or so and recalled that he was responsible for R.W.'s room. (*Id.*). He proceeded straight there and found the door closed. Upon opening it, he saw R.W., who was bloody and on the floor. (*Id.* at 202). Webster put R.W. in bed while he cleaned up the blood. He then cleaned and dressed R.W. and put him in a wheelchair. (*Id.* at 203). Webster admitted to Jones that, per protocol, he should have gotten immediate assistance for R.W. (*Id.).*

{¶ 11} The last witness at trial was Webster, who testified on his own behalf. He claimed that STNA Marjorie Gregory told him when he arrived for his shift at 11:00 p.m. that he had a "one-on-one" assignment to watch another resident, who was not specifically identified at trial. (*Id.* at 224). According to Webster, he spent his time "chasing" this resident all over the facility. (*Id.* at 224-225). Around 4:00 a.m., he managed to get the unidentified resident "calmed down," and he put the resident to bed. (*Id.* at 225). Webster testified that he then took a lunch break from approximately 4:00 a.m. to 4:30 a.m. (*Id.*). Upon returning to work, he checked on R.W., who he found on the floor behind the closed door. (*Id.* at 231-232). Webster admitted being afraid that he would get fired. (*Id.* at 232). Consequently, he cleaned and dressed R.W. and tried to clean up the blood

in the room to "cover it up." (*Id.* at 233). Webster testified that he then went and got Gregory, who asked what had happened to R.W.'s face. (*Id.* at 234). After Webster professed not to know, Beverly Prichard and his other supervisors became involved as detailed above.

{¶ 12} In her testimony, Prichard denied assigning Webster to work one-on-one with another patient at the time in question and not to check on R.W. (*Id.* at 75). Angie Copley, the director of nursing, also testified that one-on-one assignments have been made in the past but that Webster was not on a one-on-one assignment at the time of R.W.'s injury. (*Id.* at 127-128). Karen Spiers, the night shift supervisor, testified that there were no residents running around the facility at the time in question as alleged by Webster. (*Id.* at 175). Spiers also stated that there were no one-on-one assignments on the night of October 5, 2015 into the morning of October 6, 2015. (*Id.* at 193). Finally, Sergeant Jones testified that Webster never mentioned being on a one-on-one assignment during the interview at the police station. (*Id.* at 205).

{¶ 13} Based on the evidence presented, a jury found Webster guilty of violating R.C. 2903.34(A)(2), which provides that no employee of a care facility shall "[c]ommit gross neglect against a resident or patient of the facility." In finding Webster guilty, the jury rejected his affirmative defense under R.C. 2903.34(B)(2), which provides: "It is an affirmative defense to a charge of gross neglect or neglect under this section that the actor's conduct was committed in good faith solely because the actor was ordered to commit the conduct by a person with supervisory authority over the actor."

{¶ 14} Following a sentencing hearing, the trial court imposed a 180-day jail term on January 10, 2018 and placed Webster on three years of probation. The trial court

explained that it was imposing probation because it intended to release Webster from jail early. (Sentencing Tr. at 8). It appears from the record that Webster subsequently was released from jail early, jailed again, released again, and then jailed again. (See Sentencing Tr. January 10, 2018, February 14, 2018, March 5, 2018, and March 29, 2018).[1]

{¶ 15} In his first assignment of error, Webster challenges the legal sufficiency and manifest weight of the evidence to sustain his conviction. In support, he cites the absence of evidence pinpointing when R.W. became injured or establishing that R.W.'s injuries would not have occurred if he had made his rounds every two hours as required by protocol. His argument primarily is one of causation. Webster alternatively argues that he had been given a one-on-one assignment and, therefore, was justified in failing to check on R.W. every two hours. In response, the State avoids the causation argument raised by Webster. Instead, it insists that that the jury reasonably could have found him guilty based on a theory that he physically assaulted R.W. and that a delay in getting medical treatment made the injuries worse.

{¶ 16} As set forth above, Webster was convicted of gross neglect of a patient under R.C. 2903.34(B)(2). For purposes of the statute, "gross neglect" means "knowingly failing to provide a person with any treatment, care, goods, or service that is necessary to maintain the health or safety of the person when the failure results in physical harm or serious physical harm to the person." R.C. 2903.33(C)(1).

{¶ 17} Upon review, we reject the State's argument that the jury reasonably could

---

[1] Webster appears to have been released again, as he is not listed as an inmate in the Montgomery County Jail. For its part, the State asserts that Webster was released early and currently is on probation.

have found Webster guilty of gross neglect based on a theory that he actually assaulted R.W. We reach this conclusion for at least three reasons. First, the State did not charge Webster under the assault or "abuse" portion of R.C. 2903.34. The "abuse" provision states that no employee of a care facility shall "[c]ommit abuse against a resident or patient of the facility." R.C. 2903.34(A)(1). For purposes of the statute, "abuse" includes "knowingly causing physical harm or recklessly causing serious physical harm to a person by physical contact with the person[.]" If the State desired to prosecute Webster for actually assaulting R.W., it could, and should, have pursued a charge under R.C. 2903.34(A)(1), which is a fourth-degree felony. But it did not. Instead, it charged him with gross neglect, a first-degree misdemeanor, which applies to acts of omission by prohibiting a knowing failure to provide treatment or care that results in physical harm. R.C. 2903.33(C)(1).

{¶ 18} The second reason why Webster reasonably could not be convicted under a theory that he physically assaulted R.W. is that the evidence was insufficient to support a finding, beyond a reasonable doubt, that R.W.'s injuries resulted from an assault. There was no direct testimony of how R.W. was injured. The record reflects that R.W. had a documented history of falling. He also was known to become agitated and combative which could have contributed to his injuries. In closing argument, the prosecutor essentially conceded this possibility, stating: "The extent of injuries is not consistent with a fall, it might be consistent with a fall and scrambling around because nobody" was present. (Trial Tr. at 267). In short, on this record there is no way to know how R.W. was injured. Webster denied being in the room when the injuries occurred and, despite his questionable credibility because of his initial lies, there is no evidence he was in the room

when the injuries occurred. No one else saw what occurred, and the State presented little or no forensic or other evidence tending to establish that R.W. was assaulted as opposed to falling and injuring himself.

{¶ 19} We recognize night shift supervisor Karen Spiers's testimony that, in her opinion, the cut on R.W.'s head "resembled the curved part of the front of a [wheelchair] foot pedal" and that the cuts or scrapes on his hands appeared to be "defensive wounds." (*Id.* at 178). But Spiers's lay-witness testimony about the appearance of the wounds fails to establish that R.W. was assaulted. The apparent intended implication of her testimony was that someone struck R.W. with the foot pedal. It is not apparent to us, however, either that the cut on his head is in the shape of the pedal or that he also could not have fallen and hit his head on the pedal. As for the marks on R.W.'s hands, we have reviewed the photographs and, absent expert testimony on the issue, see no reasonable basis to characterize the marks as defensive in nature.

{¶ 20} The third reason why Webster reasonably cannot be convicted on an assault theory is that the evidence fails to establish, beyond a reasonable doubt, that he was the perpetrator even if R.W. was assaulted. In addition to the supervisory nurses, several other employees were working in the rough vicinity of R.W.'s room around the time the injuries occurred. Any of these people could have assaulted R.W., or he could have been assaulted by any of the numerous other Alzheimer's patients in the Heatherwood unit where he resided. Although Webster's appalling acts of cleaning up R.W., wiping up the blood evidence, and failing to report his injuries could be viewed as evidence of consciousness of guilt, we believe it is unreasonable to infer his actions mean he assaulted R.W. as opposed to hoping to conceal his failure to timely check on a patient

under his care. On the record before us, the evidence simply does not support a finding, beyond a reasonable doubt, that Webster assaulted R.W.—which may explain why the State did not charge Webster with patient abuse under R.C. 2903.34(A)(1) or bring some other assault charge.

{¶ 21} Having rejected the State's assault-theory argument, we turn now to the statute under which Webster was found guilty. As set forth above, the jury convicted him of gross neglect, for "knowingly failing to provide a person with any treatment, care, goods, or service that is necessary to maintain the health or safety of the person when the failure results in physical harm or serious physical harm to the person." R.C. 2903.33(C)(1).

{¶ 22} We see only two potential ways the jury could have found that Webster knowingly failed to provide R.W. with treatment or care. First, it could have found that he failed to make his rounds and check on R.W. every two hours as required by protocol. Second, it could have found that he failed to provide proper treatment or care after discovering R.W. injured on the floor. In analyzing these failures, we do not condone Webster's distressing conduct, but there are evidentiary shortcomings if the jury based its decision on Webster's failure to make his rounds as required. For one thing, the record reflects that charge nurse Prichard checked on R.W. sometime between 2:30 a.m. and 4:00 a.m. and found nothing amiss. The record contains uncontroverted testimony that Webster did see R.W. sometime around 4:30 a.m., at which time he cleaned and dressed R.W. and cleaned up the bloody room. Therefore, Webster's failure to make his rounds prior to that time could not have caused or resulted in R.W.'s physical harm. Most importantly, even if Webster violated the protocol by not checking on R.W. as often as

required, the record contains no evidence establishing when R.W. became injured or proving that R.W.'s injuries would not have occurred if Webster had made his rounds more frequently. Accordingly, we believe it is speculative to conclude that Webster's failure to make his rounds as required constituted a failure to provide treatment or care that resulted in physical harm.

{¶ 23} Webster's conviction for gross neglect also is problematic from an evidentiary perspective if the jury based its decision on his failure to provide treatment or care by failing to promptly notify his supervisors after discovering R.W. injured on the floor. "Gross neglect" requires knowingly failing to provide treatment or care "when the failure results in physical harm or serious physical harm to the person." R.C. 2903.33(C)(1). Notably, the State presented no medical testimony or other evidence establishing that a delay by Webster in seeking help for R.W. resulted in or caused R.W. to suffer new or additional physical harm. The outward manifestations of R.W.'s existing injuries (swelling, bruising, etc.) undeniably became more apparent as time passed at the hospital. But the physical harm itself already had occurred. In any event, the State failed to present medical evidence that a delay by Webster in seeking treatment resulted in or caused the swelling or bruising to be worse than if treatment had started an hour or so earlier.

{¶ 24} For the foregoing reasons, we find legally insufficient evidence to sustain Webster's conviction for gross neglect under R.C. 2903.34(A)(2). As explained more fully above, the State presented no evidence to support a finding that Webster's failure to make his rounds every two hours resulted in R.W.'s physical harm. The State also presented no evidence to support a finding that any delay by Webster in seeking

treatment or care for R.W. resulted in the physical harm at issue. Therefore, we conclude that the State presented inadequate evidence on the causation element of the offense of gross neglect of a patient in violation of R.C. 2903.34(A)(2) to sustain the jury's verdict as a matter of law.[2] Viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found the essential element of causation of the physical harm proven beyond a reasonable doubt. *See State v. Matthews*, 2d Dist. Montgomery No. 27718, 2018-Ohio-2424, ¶ 7 (reciting the legal standard for a sufficiency-of-the-evidence challenge). Accordingly, we sustain Webster's first assignment of error.

**{¶ 25}** In his second assignment of error, Webster contends the trial court erred in imposing both a jail sentence and probation and in imposing a statutory-maximum jail sentence. Having determined that Webster's conviction is based on legally insufficient evidence and cannot stand, we need not address his sentencing argument, which has been rendered moot. The second assignment of error is overruled for that reason.

**{¶ 26}** The judgment of the Miamisburg Municipal Court, Criminal Division, is reversed, and Webster is discharged from further criminal liability.

. . . . . . . . . . . .

---

[2] In light of this determination, we need not address Webster's argument regarding his affirmative defense under R.C. 2903.34(B)(2), which was based on him allegedly being directed to provide one-on-one care to another resident. We note too that the trial court instructed the jury on the lesser offense of patient neglect under R.C. 2903.34(A)(3). A primary difference between that offense and the offense for which Webster was convicted is that the mens rea for the lesser offense is "recklessly" failing to provide treatment or care rather than "knowingly" failing to do so. The only other difference is that the lesser offense requires serious physical harm to result, whereas the gross neglect requires either physical harm or serious physical harm. Our analysis herein would apply equally to the lesser offense and would result in a finding of legally insufficient evidence under R.C. 2903.34(A)(3) as well.

DONOVAN, J. and FROELICH, J., concur.


Copies mailed to:

Christine L. Burk
Nicole Rutter-Hirth
Hon. Robert W. Rettich, III